UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| CLAUDIA SANDERS, | Case No. 2:24-cv-00186-AKB |
| Plaintiff, | |
| | **MEMORANDUM DECISION AND ORDER GRANTING SUMMARY JUDGMENT** |
| v. | |
| KOOTENAI HOSPITAL DISTRICT d/b/a KOOTENAI HEALTH, | |
| Defendant. | |

Pending before the Court is Defendant Kootenai Health's (Kootenai) Motion for Summary Judgment (Dkt. 37). Plaintiff Claudia Sanders, proceeding pro se, has not responded to the motion. Having reviewed the record and the parties' submissions, the Court finds that the facts and legal argument are adequately presented, and that oral argument would not significantly aid its decision-making process, and it decides the motions on the record and the parties' briefing. Dist. Idaho Loc. Civ. R. 7.1(d)(1)(B); *see also* Fed. R. Civ. P. 78(b) ("By rule or order, the court may provide for submitting and determining motions on briefs, without oral hearings."). For the reasons set forth below, the Court grants Kootenai's motion for summary judgment.

## I.    BACKGROUND

The following facts are undisputed:

Kootenai is a healthcare provider that operates a hospital in Coeur d'Alene, Idaho (Dkt. 37-2 ¶ 1). At all relevant times, Kootenai was a public employer (Dkt. 1-2 at ¶ 1.2). Sanders is a licensed practical nurse (LPN) and has been a nurse for approximately forty years (Dkt. 1-2 ¶ 2.2). Kootenai employed Sanders as an LPN assigned to the Northern Idaho Crisis Center (NICC) from March 29, 2021, until her termination on August 2, 2023 (Dkt. 1-2 ¶¶ 2.4, 2.51; Dkt. 37-2 at 3).

Sanders was an at-will employee (Dkt. 37-2 at 3). Her responsibilities included triaging patients in immediate crisis situations, conducting medical screenings, and monitoring patients (Dkt. 1-2 ¶ 2.4; Dkt. 37-2 ¶ 5).

In July 2023, a Kootenai employee reported Sanders allegedly made inappropriate statements to coworkers and clients (Dkt. 37-1 ¶ 1). Kootenai initiated an investigation, and after interviewing several employees, it substantiated most of the allegations against Sanders (Dkt. 37-2 ¶¶ 13–20). Examples of Sanders' inappropriate conduct include calling patients "retarded"; stating "women deserve it if they get beat" because they "egg it on" after treating a patient who experienced domestic violence; telling a suicidal patient that taking such action would increase the chance the client's children would commit suicide; making inappropriate comments to patients and staff about the Holocaust; referring to someone as a "perfect Aryan"; telling a coworker who had visible tattoos that she has "a lesser IQ" because she has tattoos; frequently discussing her religion with patients and inviting them to her church; and making other comments about patients' race, ethnicity, and gender identity (*id.* ¶ 10; Dkt. 37-6 at 26–32). Of these allegations, Sanders admitted only that: (1) she responded to "statements made about the Holocaust"; and (2) she "prayed with a patient" at a patient's request (Dkt. 1-2 ¶ 3.29). Based on Kootenai's investigation, it decided to terminate Sanders' employment (Dkt 37-2 ¶ 22). On August 2, 2023, Sanders met with Kootenai's leadership, which informed her that her employment was being terminated and provided her a Notice of Termination stating the reasons for her termination (Dkt. 37-2 ¶ 24; Dkt. 37-8 at 12). That Notice included only the substantiated allegations that warranted termination (Dkt. 37-2 ¶ 23). Kootenai also informed Sanders that she could initiate an administrative review of the termination decision by a Vice President outside of her department, although she never requested such a review (*id.* ¶ 25).

## II.    LEGAL STANDARD

Summary judgment is proper where the pleadings, discovery, and affidavits show there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Material facts are those which may affect the outcome of the case. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute as to a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party. *See id.*

The party moving for summary judgment bears the initial burden of identifying those portions of the pleadings, discovery, and affidavits that demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the moving party meets its initial burden, the nonmoving party must go beyond the pleadings and, by its own affidavits or discovery, "set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 250 (citation modified). A nonmoving party's failure to respond to a motion for summary judgment does not constitute consent to the grant of said motion. Dist. Idaho Loc. Civ. R. 7.1(e)(2). Such failure, however, allows the Court to consider the uncontested material facts as undisputed for purposes of considering the motion. *Id.*

## III.    ANALYSIS

Sanders brings five causes of action against Kootenai: (1) violation of her First Amendment right to free speech and religion; (2) wrongful termination in violation of public policy; (3) defamation; (4) intentional infliction of emotional distress; and (5) violation of her Fourteenth Amendment right to due process (Dkt. 1-2 ¶¶ 3.8–3.42). Kootenai moved for summary judgment on all claims (Dkt. 37). Sanders did not file a response to the motion. Accordingly, the Court considers all material facts alleged by Kootenai as undisputed.

A.      **First Amendment Claims**

Sanders claims that Kootenai violated her First Amendment rights when it terminated her employment for engaging in activities protected by the First Amendment of the United States Constitution and the Idaho Constitution (Dkt. 1-2 ¶¶ 3.22–3.32). To succeed on a First Amendment retaliation claim, Sanders must show that: (1) she engaged in protected speech; (2) Kootenai took adverse employment action against her; and (3) her protected speech "was a 'substantial or motivating' factor for the adverse employment action." *Dodge v. Evergreen Sch. Dist. #114*, 56 F.4th 767, 776 (9th Cir. 2022) (quoting *Howard v. City of Coos Bay*, 871 F.3d 1032, 1044 (9th Cir. 2017)). If Sanders satisfies these elements, the burden shifts to Kootenai to demonstrate that it had a legitimate interest in "promoting the efficiency of the public services it performs through its employees" that outweighed Sanders' interest "in commenting upon matters of public concern." *Pickering v. Bd. of Educ.*, 391 U.S. 563, 568 (1968); *Berry v. Dep't of Soc. Servs.*, 447 F.3d 642, 649 (9th Cir. 2006) (holding the *Pickering* balancing test applies to constitutional challenges to restrictions on public employees' religious speech).

Here, it is undisputed that Kootenai took an adverse employment action against Sanders and that her comments about the Holocaust and instances of praying with patients in part formed the basis for her termination. Kootenai, however, argues that (1) Sanders did not engage in protected speech; and (2) even if she did, the balance of interests justified termination of her employment (Dkt. 37-1 at 4, 10). The Court addresses both in turn.

1.      **Engagement in Protected Speech**

Sanders alleges two incidents in which she engaged in constitutionally protected speech or activity that were the cause of her termination. First, she maintains that on January 23, 2022, she "discussed the Holocaust in general terms" with a Jewish patient and provided the patient a copy

of Viktor Frankl's *Man's Search for Meaning*, a book written by a psychiatrist who survived the Holocaust (Dkt. 37-4 at 16, 27; Dkt. 37-6 at 33; Dkt. 37-6 at 7). Second, she contends that she has previously prayed with patients who asked her to pray (Dkt. 1-2 ¶ 2.35; Dkt. 37-4 at 23–24).

While a government employee does not relinquish her right to freedom of expression by virtue of her employment, the First Amendment does not grant public employees immunity to speak upon matters of only personal interest that would not otherwise be afforded to those not employed by the State. *Connick v. Myers*, 461 U.S. 138, 146 (1983); *City of San Diego v. Roe*, 543 U.S. 77, 80 (2004). Rather, the First Amendment protects the rights of public employees, as citizens, to speech involving matters of public concern. *Lane v. Franks*, 573 U.S. 228, 242 (2014). Thus, a public employee engages in protected speech or activity when (1) it involves "a matter of public concern"; and (2) the employee is speaking as a private citizen rather than as a public employee. *Garcetti v. Ceballos*, 547 U.S. 410, 418 (2006). "If the answer is no, the employee has no First Amendment cause of action based on [her] employer's reaction to the speech. *Id.*

Construing the facts and inferences in the light most favorable to Sanders, the Court finds Sanders has failed to present evidence demonstrating that she was engaging in protected speech.

### a.    Matter of public concern

A government employer's personnel decisions taken in reaction to the employee's associational activity involving matters of private concern are not subject to review by a federal court. *See Connick*, 461 U.S. at 147 (finding judicial oversight not appropriate when employee expression does not touch upon a matter of public concern). Public concern is something that is newsworthy, a subject of general interest and value, or relates to government policies that are of interest to the public at large. *Roe*, 543 U.S. at 83–84. Speech involves public concern when it relates to political, social, or governmental policies that are a subject of general interest and value

to the public at large. *Connick*, 461 U.S. at 147–48. Speech that does not relate to "any matter of political, social, or other concern to the community" is not protected in the employment context. *Id.* at 146. Whether speech touches upon a matter of public concern is determined using a case-by-case inquiry into the "content, form, and context of a given statement." *Id.* at 147–48; *Rankin v. McPherson*, 483 U.S. 378, 385 (1987).

The record shows that Sanders intended to convey no message of "public concern" in her January 23 discussion with a patient about the Holocaust. In her deposition, Sanders stated she had a conversation with a Jewish patient about the Holocaust, in which she recommended *Man's Search for Meaning* (Dkt. 37-4 at 16, 26). The patient later reported feeling uncomfortable by Sanders sharing her personal beliefs (*id.* at 26; Dkt. 37-2 ¶ 7). In an email memorializing a discussion Sanders' supervisor had with Sanders about the interaction, Sanders said she shared the book with the patient "because the [patient] was Jewish, and she thought it would be helpful" (Dkt. 37-6 at 6). Clearly, Sanders was not attempting to stimulate a dialogue on the Holocaust. By her own admission, her motive was to comfort a patient at best. Alternatively, her comments reflected her own personal interests. *See Hawkins v. Dep't of Pub. Safety & Corr. Servs.*, 602 A.2d 712, 717–18 (Md. 1992) (holding plaintiff's comments on the Holocaust were personal and did not concern public issues). Under either characterization, her conduct amounted to a private interest and is not entitled to greater First Amendment protection.

Nor was Sanders' act of praying with patients a matter of public concern. Sanders explained that she only prayed when asked and that she never initiated prayer or broader conversation about religion (Dkt. 37-4 at 23–24). Indeed, Sanders admitted that the topic of prayer came up often with her because she was "looking for common grounds with people and asking about . . . what things help them" (Dkt. 37-4 at 23). Thus, the content of her prayers was not part of a broad social or

policy statement. Nor was she shedding light on any matter with regard to Kootenai's operations that would be important to the public because her prayers do not touch upon the way in which a government institution is discharging its responsibilities. *See, e.g.*, *Pickering*, 391 U.S. at 569–70 (finding that criticism of school district's allocations of funds is speech on matter of public concern). Regardless of whether Sanders initiated the prayer, it was meant for the consumption of the patient only. Thus, Sanders' religious speech is not a matter of public concern.

### b. Speech made as a private citizen or as a public employee

The First Amendment does not protect speech made pursuant to a government employee's official duties. *Garcetti*, 547 U.S. at 421. "A person speaks in a personal capacity if he 'had no official duty to make the questioned statements, or if the speech was not the product of performing the tasks he was paid to perform.'" *Dodge*, 56 F.4th at 778 (quoting *Posey v. Lake Pend Oreille Sch. Dist. No. 84*, 546 F.3d 1121, 1127 n.2 (9th Cir. 2008)) (citation modified). Here, Sanders had no official duty to engage in prayer with patients or discuss the Holocaust. Her speech, however, was the product of performing the tasks that she was paid to perform as a NICC triage nurse— "ensuring the health, comfort, and safety of patients and conducting an initial medical screening and suicide assessment" (Dkt. 37-2 ¶ 5).

Sanders admitted that she prayed with patients under the belief that such conduct fell within her job responsibilities (Dkt. 37-4 at 23). This conduct is different than the high school football coach in *Kennedy v. Bremerton School District*, 597 U.S. 507 (2022), who was terminated after offering a quiet personal prayer midfield after games. There, the Court held the coach engaged in prayer as a private citizen because he prayed silently after the game was over and the players had left the field. *Id.* at 525. The Court noted that the coach's prayer "[did] not involve leading prayers with the team or before any other captive audience." *Id.* The instant case is distinguishable because

Sanders did not engage in silent, personal prayers—she led prayers with patients. The timing and circumstances of her prayers confirm the point. Sanders explained that she believed engaging in prayer was "[her] responsibility to find out what coping mechanisms [patients] use that are successful and to encourage them in the use of those," and that included encouraging prayer (Dkt. 37-4 at 23). Thus, Sanders believed she was filling a responsibility imposed by her employment by praying with patients. Because Sanders offered her prayers while acting within the scope of her duties as a nurse, she engaged in government speech attributable to Kootenai.

Sanders' January 23 discussion on the Holocaust with a patient also was made pursuant to her official duties as a NICC triage nurse. While evaluating a patient who "came in highly escalated," Sanders made comments regarding the Holocaust and recommended a book to her, stating generally that the Holocaust was an opportunity for people to find meaning in God (Dkt. 37-1 at 4; Dkt. 37-4 at 16, 27). The purpose of the patient screening process is to "identify if [the patient's] medical needs are urgent and whether the [patient] needs to seek immediate medical care" (Dkt. 37-6 at 29). Sanders testified that her role was to assist NICC patients in crisis by talking with them about their problems and helping to stabilize them (Dkt. 37-2 ¶ 5). Like the teacher in *Johnson v. Poway Unified School District*, 658 F.3d 954, 968 (9th Cir. 2011), Sanders "took advantage of [her] position to press [her] particular views upon the impressionable and 'captive' minds before [her.]" Given the context of the patient screening process and Sanders' role therein, her speech was reasonably viewed by patients as officially promoted by Kootenai. Because Sanders' speech owes its existence to her position, she spoke as an employee—not as a citizen. Therefore, the Court concludes that Sanders did not engage in protected speech.

### 2.    Kootenai's Administrative Interests Outweigh Sanders' Interests

Having concluded that Sanders did not engage in protected speech, the Court does not need to address a *Pickering* balance of the competing interests. *Garcetti*, 547 U.S. at 423 (holding the *Pickering* balancing test applies only if the employee spoke as a citizen on a matter of public concern). But even assuming Sanders had spoken as a citizen on a matter of public concern, the Court concludes that Kootenai's interests far outweigh any conceivable countervailing interests.

In performing this balancing test, the burden shifts to the government employer to show that the government's interest in regulating the speech outweighs the employee's interest in engaging in the protected speech. *Pickering*, 391 U.S. at 568. Government employers have a legitimate interest in maintaining proper discipline over their employees and "promoting the efficiency of the public services it performs through its employees." *Id.*; *Connick*, 461 U.S. at 150. To promote these interests, government employers are afforded wide latitude to remove employees whose disruptive conduct threatens the mission and function of the employer's operations. *Connick*, 461 U.S. at 151–52. When weighing the interests of the parties in *Connick*, the Supreme Court noted the level of workplace disruption necessary to justify a termination is based on how much the employee's speech involved matters of public concern. *Id.* The Court found, however, that an employer does not need to wait for an employee's speech to unfold to such an extent "that the disruption of the office is manifest before taking action." *Id.* at 152 (citation modified).

Here, Kootenai terminated Sanders after receiving numerous complaints about her speech, including a Google review (*see, e.g.*, Dkt. 37-2 ¶¶ 7, 16; Dkt. 37-4 at 107; Dkt. 37-6 at 13, 22, 28). One of these complaints involved Sanders' comments on the Holocaust, stating Sanders "forced a conversation about the Holocaust" wherein she told the patient the "death camps were an opportunity for people to find meaning in God" (Dkt. 37-6 at 7–8; Dkt. 37-2 ¶ 7). The patient, who

was being treated for acute suicidal ideations, stated that the conversation "was the opposite of therapeutic" (Dkt. 37-6 at 7). Kootenai was not required to continue tolerating such disruptive speech. This fact alone justifies its decision to terminate Sanders. *See Waters v. Churchill*, 511 U.S. 661, 681 (1994) ("As a matter of law, this potential disruptiveness was enough to outweigh whatever First Amendment value the speech might have had.").

Additionally, the danger to the employer's successful functioning from the employee's speech increases when the employee serves a public contact role. *Rankin*, 483 U.S. at 390–91. In *Rankin*, the Court found the employee's politically charged statements to a coworker did not adversely affect the functioning of the Constable-employer's office because her clerical position was administrative and did not involve contact with the public. *Id.* at 390–92; *see also McEvoy v. Spencer*, 124 F.3d 92, 103 (2d Cir. 1997) ("The more the employee's job requires public contact, the greater the state's interest in firing her for expression that offends her employer.") (citation modified). Here, Sanders works for a public hospital, the mission of which is to provide "positive, compassionate" healthcare services to the local community (Dkt. 37-6 at 2). As a public hospital, Kootenai relies on its employees to maintain positive relationships with the community it serves.

Furthermore, LPNs "are solely responsible for the medical screening and monitoring of [NICC patients]" (Dkt. 37-4 at 92). Thus, any patient who enters the NICC would necessarily engage with an LPN like Sanders. Unlike the employee in *Rankin*, Sanders' position as a NICC LPN put her in constant contact with the public, making it more likely that her comments on the Holocaust compromised Kootenai's successful functioning. It is not unreasonable for Kootenai to consider Sanders' statements about the Holocaust, which implied that it either did not happen or that it was a good thing (Dkt. 37-2 ¶ 18), disruptive to its ability to serve the community. That her comments did in fact lead to disruption further bolsters Kootenai's decision to terminate.

**MEMORANDUM DECISION AND ORDER GRANTING SUMMARY JUDGMENT – 10**

Kootenai was also justified in terminating Sanders for engaging in prayer with patients. The Supreme Court has long recognized that the government has a compelling interest in avoiding the appearance of taking a position on questions of religious belief when the restriction applies to government employees engaging in religious speech while providing state-sponsored services. *See Santa Fe Indep. Sch. Dist. v. Doe*, 530 U.S. 290, 302–06 (2000) (prohibiting prayer at football games where prayer offered pursuant to school policy and during a school-sponsored event); *Lee v. Weisman*, 505 U.S. 577, 596–99 (1992) (prohibiting school sponsorship of prayer at graduation ceremonies); *Cnty. of Allegheny v. ACLU*, 492 U.S. 573, 593–94 (1989) ("The Establishment Clause prohibits government from appearing to take a position on questions of religious belief.") (citation modified), *abrogated on separate grounds by Town of Greece v. Galloway*, 572 U.S. 565 (2014). Speech is more likely to undermine an employer's mission when the nature of the employee's role involves a grant of authority, contact with the public, and access to confidential records. *Rankin*, 483 U.S. at 390–91.

Here, Sanders engaged in religious speech while providing state-sponsored services—praying with patients (Dkt. 37-6 at 17, 28, 30). Thus, Sanders promoted religious messages while working with patients on Kootenai business, raising a legitimate Establishment Clause concern. That concern is bolstered by Sanders' admission that part of her responsibility as a NICC triage nurse was offering a prayer with a patient who asked her to pray with them (Dkt. 37-4 at 23). This permits the state to place a slight burden on Sanders' speech: Sanders may not share her religious beliefs with clients while conducting state business. Therefore, Kootenai's need to avoid possible violations of the Establishment Clause outweighs the restriction's curtailment of Sanders' religious speech on the job.

Therefore, the balance of interests weighs in Kootenai's favor. Accordingly, Sanders' First Amendment claim cannot proceed.

**B.      Wrongful Termination in Violation of Public Policy**

Sanders' next cause of action alleges she suffered wrongful termination in violation of public policy when she was terminated for exercising "her legal rights and privileges of speech and religion" (Dkt. 1-2 ¶¶ 3.8–3.15). In Idaho, at-will employees may be terminated at any time and for any reason that does not violate public policy. *Bollinger v. Fall River Rural Elec. Co-op., Inc.*, 272 P.3d 1263, 1269 (Idaho 2012). This narrow public policy exception "is triggered only where an employee is terminated for engaging in some protected activity, which includes: (1) refusing to commit an unlawful act, (2) performing an important public obligation, or (3) exercising certain legal rights and privileges." *Id.* at 1271. The employee bears the burden of establishing both that she was engaged in a protected activity and that there was a causal connection between the protected activity and her termination. *See Venable v. Internet Auto Rent & Sales, Inc.*, 329 P.3d 356, 361 (Idaho 2014). Here, it is undisputed that Sanders was an at-will employee. Thus, Sanders must establish both that she engaged in a protected activity and that the protected activity was causally connected to her termination.

"Courts have recognized that public policy expressed in the constitution and the statutes of the state may serve as a basis for finding an exception to the employment at-will doctrine." *Edmondson v. Shearer Lumber Prods.*, 75 P.3d 733, 738 (Idaho 2003). The First Amendment to the United States Constitution and Article I of the Idaho Constitution prohibit the Government from abridging freedom of speech and religion. These rights, however, are not absolute. Accordingly, the Idaho Supreme Court employs a four-part test to determine whether speech is constitutionally protected and therefore precludes an adverse employment decision that largely

mirrors the First Amendment analysis set forth by the Supreme Court in *Pickering*.[1] *Lockhart v. Idaho Dep't of Fish & Game*, 903 P.2d 135, 141 (Idaho Ct. App. 1995); *Gardner v. Evans*, 719 P.2d 1185, 1195 (Idaho 1986).

As discussed above, Sanders' speech did not touch upon matters of public concern, nor did the balance weigh in her favor. Because Sanders' speech fails to satisfy these threshold requirements, the Court need not apply the remaining two factors. Accordingly, Sanders cannot establish that Kootenai terminated her employment in violation of public policy. Therefore, Kootenai was permitted to terminate Sanders' at-will employment.

## C.    Defamation

Sanders' next claim is for defamation, alleging that Kootenai defamed her by communicating damaging information to others by implication that placed her in a false light (Dkt. 1-2 ¶¶ 3.16–3.18). While her complaint does not specify what communication she is referring to, Sanders stated in a deposition that her defamation claim is based on the Notice of Termination provided to her on July 3, 2023 (Dkt. 37-1 at 30; Dkt. 1-2 ¶ 2.17). To succeed on a defamation claim, Sanders must establish (1) Kootenai communicated information concerning Sanders to others; (2) the information was defamatory; and (3) Sanders suffered injury because of the communication. *Clark v. The Spokesman-Review*, 163 P.3d 216, 219 (Idaho 2007). A statement is defamatory if it "tends to harm a person's reputation, usually by subjecting the person to public

---

[1]    The only substantial difference is that Idaho employs a fourth step—if the employee spoke on a matter of public concern, the balance of interests weigh in their favor, and the protected speech was a substantial or motivating factor in the detrimental employment decision, "then the employer is required to show by a preponderance of the evidence that it would have reached the same decision even in the absence of the protected speech." *Lockhart v. Idaho Dep't of Fish & Game*, 903 P.2d 135, 141 (Idaho Ct. App. 1995).

contempt, disgrace, or ridicule, or by adversely affecting the person's business." *Siercke v. Siercke*, 476 P.3d 376, 385 (Idaho 2020).

Even where a statement is defamatory, the publisher may not be liable if the publication was privileged. *Wilson v. St. Luke's Reg'l Med. Ctr., Ltd.*, No. 13-CV-00122-BLW, 2014 WL 7186811, at *14 (D. Idaho Dec. 16, 2014). Relevant here is the common-interest privilege, which "protects individuals from liability if a defamatory statement is made to someone who shares a common interest with the speaker." *Id.* This conditional privilege may be lost only if the publication is made with "express malice." *Id.* Express malice is defined as "the publication of defamatory matter in bad faith, without belief in the truth of the matter published, or with reckless disregard of the truth or falsity of the matter." *Barlow v. Int'l Harvester Co.*, 522 P.2d 1102, 1113 (Idaho 1974), *abrogated on separate grounds by Siercke v. Siercke*, 476 P.3d 376, 386 (Idaho 2020). This definition is akin to *New York Times*' standard of "actual malice," i.e., publishing a statement "with knowledge that the statement made was false or was made with reckless disregard of whether the statement was false or not." *Steele v. Spokesman-Review*, 61 P.3d 606, 609 (Idaho 2002) (summarizing *New York Times*' definition of actual malice). Express malice concerns the speaker's attitude towards the truth—not their attitude towards the plaintiff personally. *Wilson*, 2014 WL 7186811, at *14. To establish that a speaker had a reckless disregard for truth, "[t]here must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication." *Wiemer v. Rankin*, 790 P.2d 347, 356 (Idaho 1990) (quoting *Harte-Hanks Commc'ns, Inc. v. Connaughton*, 491 U.S. 657, 688 (1989)).

Sanders cannot establish the requisite elements of defamation. First, Sanders has not alleged that Kootenai distributed the Notice to anyone but her (Dkt. 37-2 ¶ 26). Moreover, there is no evidence that any third party has ever requested the Notice or inquired into the reasons for

Sanders' termination (Dkt. 37-2 ¶ 26). As a result, the Court concludes that this Notice, in and of itself, is not a defamatory communication.

Even if the Notice was communicated to another, that communication is protected by the common-interest privilege. *See Barlow*, 522 P.2d at 1112–13. Moreover, Sanders cannot defeat the privilege because she has not established that Kootenai published the information with malice—knowledge or reckless disregard of the truth. Quite the contrary, Kootenai conducted a thorough investigation into Sanders' alleged misconduct, including interviewing five employees, Sanders' supervisor, and Sanders herself (Dkt. 37-2 ¶¶ 13, 16–17). The Notice included only allegations that were substantiated (*id.* ¶ 22) (explaining allegations that had either not been sufficiently substantiated by the investigation or did not warrant termination of employment were not included in the Notice). Based upon these facts, the Court is unable to conclude that Kootenai entertained serious doubts as to the truth of the Notice or that it actually had a high degree of awareness of probable falsity. There is no evidence indicating that Kootenai should have questioned the credibility of the employees it interviewed. Therefore, the Court holds that Kootenai did not have actual malice, and any potential communication was privileged.

## D.    Intentional Infliction of Emotional Distress

Sanders also alleged a claim of intentional infliction of emotional distress (IIED), arguing that Kootenai terminated her employment in a manner designed to cause the maximum amount of emotional distress (Dkt. 1-2 ¶¶ 3.19–3.21). To succeed on such a claim, Sanders must show that (1) Kootenai's conduct was intentional or reckless, (2) Kootenai's conduct was extreme and outrageous, (3) there exists a causal connection between Kootenai's pertinent conduct and Sanders' emotional distress, and (4) Sanders' emotional distress was severe. *Nation v. Idaho Dep't of Corr.*, 158 P.3d 953, 968 (Idaho 2007). Conduct is extreme and outrageous if it "rise[s] to the

level of 'atrocious' and 'beyond all possible bounds of decency' that would cause an average member of the community to believe it was 'outrageous.'" *Id.* Mere termination of at-will employment "cannot constitute extreme and outrageous behavior." *Bollinger*, 272 P.3d at 1274. "Summary judgment is proper when the facts allege conduct of the defendant that could not reasonably be regarded as so extreme and outrageous as to permit recovery for intentional infliction of emotional distress." *Edmondson*, 75 P.3d at 741 (citation modified).

The Court concludes that although Kootenai's conduct was intentional, it was not extreme and outrageous. Sanders alleges that Kootenai's conduct was extreme and outrageous because "[t]he means and manner of Kootenai Health's termination was intentionally designed to inflict maximum distress on [her]" (Dkt. 1-2 ¶ 3.21). In her deposition, Sanders explained that the decision to place a Notice of Termination in her file "marred [her] record for life" (Dkt. 37-1 at 32–33). The Court already found, however, that the contents of the Notice were not defamatory. Additionally, Sanders was an at-will employee, so the mere fact that she was terminated cannot constitute extreme and outrageous behavior. Kootenai's conduct was at no point so atrocious or so far beyond all possible bounds of decency that it could reasonably be regarded as so extreme and outrageous as to permit recovery for IIED. Therefore, the Court grants summary judgment on Sanders' IIED claim.

**E.      Fourteenth Amendment Due Process**

Finally, Sanders alleges that Kootenai deprived her of her Fourteenth Amendment rights by tarnishing her reputation "in a manner calculated to make it impossible for her to regain employment" without giving her a meaningful opportunity to clear her name (Dkt. 1-2 ¶¶ 3.38, 3.41). A plaintiff's liberty interest is implicated when the government makes a charge against the plaintiff capable of severely injuring her community standing. *Wenger v. Monroe*, 282 F.3d 1068, 1074 (9th Cir. 2002) (citing *Llamas v. Butte Cnty. Coll. Dist.*, 238 F.3d 1123, 1129 (9th Cir. 2001)).

Fourteenth Amendment due process protections apply in the employment termination context if (1) the accuracy of the charge is disputed, (2) the charge is publicly disclosed, and (3) the charge "is made in connection with the termination of employment or the alteration of some right or status recognized by state law." *Llamas*, 238 F.3d at 1129. When these conditions are met, the state must provide a name-clearing hearing. *Cox v. Roskelley*, 359 F.3d 1105, 1110 (9th Cir. 2004).

The information that Kootenai placed in Sanders' employee file is not severely harmful. To be severely harmful, the "government's stigmatizing statements" must "effectively exclude the employee completely from her chosen profession." *Blantz v. Cal. Dep't of Corr. & Rehab.*, 727 F.3d 917, 925 (9th Cir. 2013). A terminated employee's reduced income and diminished reputation do not implicate the Fourteenth Amendment. *Id.* Additionally, the charge must be one of moral turpitude, such as dishonesty or immorality, and not merely a difficult personality. *Stretten v. Wadsworth Veterans Hosp.*, 537 F.2d 361, 366 (9th Cir. 1976). Thus, "a liberty interest [is] not infringed when the only loss suffered at the hands of the Government is a 'stigma' or damage to reputation." *Id.* at 365; *Paul v. Davis*, 424 U.S. 693, 708–09 (1976).

Here, Sanders argues that Kootenai "inflicted an indelible stigma upon [her], damag[ing] her career as a nurse, [and] attaching a 'badge of infamy' to her (Dkt. 1-2 ¶ 3.41). Though she claims that placing the Notice in her file "[made] it impossible for her to regain employment consistent with her experience and skills," she in fact found employment as an LPN only three weeks after submitting her first application (Dkt. 37-2 ¶ 27). Sanders testified that she disclosed to her new employer the reasons Kootenai gave for her termination, yet they offered her employment anyway (Dkt. 37-4 at 40). Thus, the statements in Sanders' employee file did not completely exclude her from her chosen profession as an LPN. Furthermore, any alleged damage

to her reputation as a nurse alone is insufficient to implicate a liberty interest. Therefore, summary

judgment is proper on Sanders' due process claim.

### IV.    ORDER

**IT IS ORDERED that:**

1.    Defendant Kootenai's Motion for Summary Judgment (Dkt. 37) is **GRANTED**.

2.    Plaintiff Claudia Sanders' Complaint (Dkt. 1-2) is **DISMISSED WITH PREJUDICE**.

DATED: February 20, 2026

Amanda K. Brailsford
U.S. District Court Judge